## THE STATE v. THOMAS DRISCOLL, Appellant.

### Division Two, June 20, 1911.

1. INSTRUCTION: Manslaughter: Provocation: Murder in Second Degree. An instruction for manslaughter in the fourth degree is proper where the evidence shows that the killing was done under the influence of passion suddenly aroused by an assault. Such an assault if committed a sufficient length of time prior to the killing for the passion aroused thereby to cool, will not authorize such an instruction; but if there had been such previous assault, and immediately before the killing deceased leaped upon and grabbed defendant, then such an instruction should be given. And this last condition being present, the court did not err in refusing to confine the case to murder in the second degree, but properly gave an instruction for fourth degree manslaughter, of which offense defendant was convicted.

2. ————: On Self-Defense: Based on Defendant's Testimony. Where deceased, a large, vicious, brutal man, without any provocation whatever had assaulted defendant earlier in the evening and knocked him down, and defendant testified that later, as he was drinking beer in a saloon, deceased called him a vile name and said he would "get" him yet; that he was scared; that, passing through the same swinging door leading from the saloon to a store through which deceased had gone, he took a butcher knife from the counter to defend himself in case he should be again assaulted; that when he got to

the door leading to the street deceased leaped at him and grabbed him, and that he then jabbed deceased with the knife, killing him, there was enough in defendant's own evidence to authorize an instruction on self-defense, although defendant's testimony as to certain material features is not in harmony with that for the State.

3. ————: **Securing Weapon: Comment on Evidence.** The court properly refused an instruction telling the jury that "there was nothing wrong in defendant taking the knife from the counter of the grocery store, provided he took it for the purpose of defending himself in case he was attacked." The manner in which he secured the knife was an item of testimony competent for the jury to consider, but the court properly refused to comment in an instruction on this item of evidence.

Appeal from St. Louis Circuit Court.—*Hon. Eugene McQuillin,* Judge.

AFFIRMED.

*Charles Joy* and *Arthur N. Sager* for appellant.

(1) The offense, if any, committed by defendant was murder in the second degree, or it was a case of justifiable homicide. There was no element of manslaughter in the case and no evidence justifying the court in submitting an instruction defining manslaughter to the jury. Sec. 4449, R. S. 1909; State v. Diller, 170 Mo. 1; State v. Petit, 119 Mo. 416; State v. Goldsby, 215 Mo. 48; Sec. 4467, R. S. 1909; State v. McKenzie, 177 Mo. 711. (2) The court committed a reversible and prejudicial error in instructing the jury that they might find the defendant guilty of manslaughter in the fourth degree, there being no evidence upon which to predicate such an instruction. State v. Punshon, 124 Mo. 448; State v. Hollingsworth, 156 Mo. 178; State v. Kilgore, 71 Mo. App. 546; State v. Douglas, 15 Mo. App. 1.

*Elliott W. Major,* Attorney-General, *Charles G. Revelle* and *John M. Dawson,* Assistant Attorneys-General for the State.

(1)   There was ample evidence to  support the verdict of the jury, and the  jury  having settled all conflict of evidence, this court will not interfere nor disturb the verdict.   State v. Rollins, 186 Mo. 505; State v. Miller, 188 Mo. 379; State v. Smith, 190 Mo. 723.   (2)   Instruction 11, refused, was properly refused.   First, because it singled out and commented upon a part of the evidence; and, second, the substance of this instruction had been fully covered by instructions 7 and 8, given on behalf of the State.   (3)   Appellant complains in his motion for new trial to the action of the court in giving to the jury an instruction on manslaughter in the fourth degree.   In the giving of this instruction the trial court cannot be convicted of error.   The record shows that the State introduced evidence tending to show that the appellant, in the heat of passion, induced by reasonable provocation, without malice and without premeditation, cut and stabbed the deceased.   It has been held in this State that "the passion which will reduce homicide to the grade of manslaughter is an  excited state of mind, produced by some lawful provocation, such as a blow or an assault of any kind upon the person." State v. Ellis, 74 Mo. 207; State v. McKenzie, 177 Mo. 712; State v. Sumpter, 153 Mo. 436; State v. Meadows, 156 Mo. 110; State v. Brown, 64 Mo. 367; State v. Ashcraft, 170 Mo. 409; State v. Diller, 170 Mo. 1; State v. Kindred, 148 Mo. 270; State v. Gartrell, 171 Mo. 489.

FERRISS, J.—Under an information  charging him with murder in the second degree for the killing of one John DeWitt, defendant was convicted of manslaughter in the fourth degree, the jury assessing his punishment at two years in the penitentiary.  Judg-

ment of sentence was pronounced and entered accordingly, from which judgment defendant appeals.

The evidence tended to prove the following facts:

On the evening of June 26, 1909, defendant, deceased and one or two other men were drinking beer in a livery stable located on North Market street, near Prairie avenue, in the city of St. Louis. Said livery stable was owned by one John Schweitzer, by whom defendant was employed as driver. At the southwest corner of North Market street and Prairie avenue was a grocery store and saloon, owned by H. J. Roeder, the main entrance being from Prairie avenue, which ran north and south. A partition separated the store and saloon, but swinging doors in the partition allowed of communication between both. The street entrance to the saloon was from North Market street. After the beer-drinking referred to, deceased separated from his companions and went to Roeder's saloon. About eight o'clock that evening, defendant and two companions, Roberts and Hurlehey, were at the northwest corner of Prairie avenue and North Market street. Roberts asked Hurlehey to buy him a drink, and Hurlehey replied, "I will buy you no drink." Just at that time deceased, preceded by one Maxwell, was crossing the street from said saloon. Hearing Hurlehey's remark, deceased said, "You won't buy me a drink?" Hurlehey explained that his remark had reference only to Roberts. Deceased, who was somewhat intoxicated, then turned on the defendant, called him a vile name, and, without the smallest provocation, struck him on the head. Defendant fell, striking his head on the sidewalk, and lay there several minutes, apparently unconscious. Maxwell said to deceased, "You oughtn't to do that," whereupon deceased applied to Maxwell the same epithet that he did to the defendant, and struck twice at Maxwell, who received the blows on his arm. Maxwell did not know his assailant, nor had he ever seen him before.

Defendant, having recovered consciousness, got up and walked away, saying, "I am going to get a policeman and get you all arrested." After proceeding south on Prairie avenue for a short distance, defendant returned and went into Roeder's saloon where he washed the blood off his wounds. He then invited one Feisel to the bar, and called and paid for two glasses of beer. Deceased came in while they were drinking same and ordered a glass of beer. He spoke to Feisel and gave defendant an angry look. After drinking the beer, deceased left the saloon, went into the grocery store, spoke to Roeder, the proprietor, and told him that he was going home. A few minutes after deceased left the saloon, defendant went through the swinging door into the store. Roeder was waiting on customers, and John Schweitzer, owner of the livery stable alluded to, was assisting him. Near the door through which defendant entered the store was a small meat counter from which defendant picked up a large butcher knife, after securing which he walked quickly towards the street entrance where he encountered the deceased and stabbed him with said knife. Deceased was heard to say, "He has got me; let me get him." Defendant, being either pushed or struck by deceased, fell back into a tub of chickens, and the knife was wrenched from him by Schweitzer. Thomas Ogle, a witness for the State, saw defendant come through the swinging door and run towards the deceased, and then saw defendant "make an effort to punch DeWitt in the jaw, like with his fist," but the witness did not see a knife in defendant's hand. The evidence for the State further tended to show that defendant stabbed the deceased without warning or any immediate provocation, and that at the time deceased was stabbed he was talking to Schweitzer's mother near the door, she having just come in to purchase groceries. Deceased died next day from the wound inflicted by the knife. The wound was in the right side, between the tenth and

eleventh ribs, and was about six inches deep, piercing the liver, death being caused by hemorrhage of the liver.

Defendant testified that at the time he and Feisel were drinking at the saloon bar, deceased came in, called for a glass of beer, and said to defendant, "You son-of-a-bitch, I will get you yet." Feisel testified that he heard deceased say something to defendant, but that he did not understand what he said. It appeared that Feisel could not hear well. Defendant further testified that he was scared, and took the butcher knife for the purpose of defending himself in case he should be attacked by deceased, who had previously uttered a threat against him; that when he got to the door leading to the street deceased leaped at him, and that he then jabbed deceased with the knife, but that the weight of the deceased caused the knife to enter his side; that one of his (defendant's) eyes was injured and closed, and that he did not see deceased until the latter leaped on him; that after the struggle with deceased he went back through the partition door into the saloon, and was in the act of leaving the saloon through the North Market street entrance thereto when he again encountered the deceased, who knocked him into the street, where he lay senseless for some time.

One J. F. Higgins testified for the defendant that some time after the stabbing occurrence he found defendant in an alley near the saloon; that defendant appeared dazed and was unable to speak; that he took the defendant to the latter's home, and left him in charge of his sisters, who washed his wounds and put him to bed.

Defendant was arrested the same night and taken to the holdover, and his injuries were attended to by a physician there from the night of June 26th until July 9th.

The evidence shows that deceased, a little while before he first attacked the defendant, assaulted another man named Gray, for no other reason seemingly than that Gray was a "Hoosier." He had been prosecuted and fined for disturbing the peace, and defendant testified that about two years previously he was beaten by deceased, from which beating he was "laid up for about a week." It would appear from the evidence that deceased, who was a large, powerful man, was vicious, brutal and quarrelsome. Defendant was a small man, and his reputation for peace and orderly conduct was good.

I. The defendant complains that the evidence did not justify an instruction on manslaughter in the fourth degree, and also that two instructions, offered by defendant and refused, should have been given.

The evidence for the State makes a strong case of murder in the second degree, and we think the defendant was fortunate in escaping conviction for that offense. An instruction for manslaughter in the fourth degree is proper where the evidence shows that the killing is done under the influence of passion suddenly aroused by an assault. It may properly be said that the assault which was committed by the deceased upon the defendant earlier in the evening would not in itself justify an instruction for manslaughter in the fourth degree because there was sufficient time for the passion aroused by that assault to cool.

The defendant testified as follows:

"Q. When you got to the door what happened? A. DeWitt made a leap at me. I had that knife in my hand—I don't know which hand; and as he did, I plunged the knife through him." Further, he says, "When I got up to him, DeWitt leaped for me, and he got it plunged in his body—against the knife was how he got stabbed." A further question: "You were how far from him when you first saw him? A. Right

on top of him, and he grabbed me.  Q.  And when he grabbed you, you stuck it into him?  A.  Yes, his weight stuck the knife into him.  Q.  Don't you mean to say you held it like that (illustrating), and he ran into it?  A.  No, I made a jab at him.''

Defendant claims that, in view of the prior assault upon him, and the threat made a few minutes before in the bar-room by the deceased, he, the defendant, was justified in apprehending that when the deceased leaped for him at the door he intended to do him great bodily harm, and that he was therefore justified in stabbing him in self-defense.  This question was submitted to the jury by an instruction on self-defense extremely favorable to the defendant.

The evidence shows that an assault was made upon the defendant by the deceased, that when defendant encountered the deceased at the door deceased leaped upon and grabbed him, and that defendant immediately used the knife.  The mere fact that the deceased leaped upon and grabbed defendant—in other words, assaulted him—was a sufficient foundation, we think, for the instruction for manslaughter in the fourth degree, as such conduct on the part of the deceased was calculated to arouse sudden passion in the breast of defendant and deprive him of the capacity to think coolly of the natural consequences of his act.  The evidence for the State tends to show that the defendant, brooding over the wrong which he had suffered at the hands of the deceased earlier in the evening, and suffering from the effects of that assault, seized the knife which was lying on the meat counter in the store, rushed towards the deceased, who was standing in the doorway talking peaceably with Mrs. Schweitzer, and stabbed him without any warning.  The self-defense theory is based alone upon the testimony of the defendant.  We think, under the facts in this case, that the defendant was fortunate in securing a conviction for manslaughter in the fourth degree.  We are satisfied

· that there is enough in his own evidence to justify the giving of that instruction.

II.    The instructions offered by the defendant were properly refused.    One of these instructions was as follows:

"You are instructed that there was nothing wrong in defendant taking the knife from the counter in Roeder's grocery store, providing he took it for the purpose of defending himself in case he was attacked."

The question in this case is not whether the defendant did wrong in securing possession of the knife, but whether he committed an offense, and if so what offense, in using it as he did upon the deceased. The manner in which he secured the knife was an item of testimony competent for the jury to consider, but the court properly refused to comment on this item of evidence in an instruction.

The substance of the other instruction asked by the defendant is fully covered by the instructions given for the State, and needs no further comment.

In no other respects than those mentioned above does the defendant complain of the trial.

The judgment is affirmed.

*Kennish, P. J.,* and *Brown, J.,* concur.