## THE STATE v. ALBERT SINCLAIR, Appellant.

Division Two, May 20, 1913.

1. **MARITAL RELATION: Husband's Right to Enter Wife's Home.** By the statute (Sec. 8309, R. S. 1909) declaring that "all real estate . . . belonging to any married woman at her marriage . . . shall, together with all income, increase and the profits thereof, be and remain her separate property and under her sole control," a wife is given the exclusive control of her real estate, regardless of whether she is living with or apart from her husband, and regardless of whether she is faithful or unfaithful to her marital obligations; and a husband, who is living apart from his wife, has no present right or authority, without her consent, to enter upon her real estate belonging to her at the time of their marriage and whereon she has her own domicile.

2. ———: ———: **Right of Wife to Protection: Erroneous Instruction.** The wife having the right to exclude from her home and premises her husband from whom she had separated, and having requested the defendant (her son) to protect her, it was reversible error to instruct the jury that the husband had the same right to enter the wife's home at the time defendant killed him as defendant had, and that defendant had no legal right to forbid deceased to enter upon the wife's premises.

3. ———: ———: ———: **Forbidding Husband Entrance.** Whether or not it was necessary for defendant to forbid the husband to enter the wife's premises is a question for the jury; but the forbidding of him to enter, by the wife's son who had been requested by her to protect her, did not destroy the son's right of self-defense.

4. ———: ———: **Trespass: Defense.** The mere act of a husband in attempting to enter his wife's house without her permission or consent does not of itself justify her son, who has been requested by her to protect her, in killing the husband. No more force than is necessary should ever be used in preventing a trespass.

5. **JUSTIFIABLE HOMICIDE: Threats and Demonstration.** Where deceased, who was living apart from his wife, had made enough threats to warrant the gravest apprehension on the part of herself and her son, and deceased had assumed a menacing attitude and was making menacing demonstrations at the time the son shot him, the shooting was justifiable.

6. **HOMICIDE: Second Shot: Intent: Comment.** It was not error to refuse to instruct the jury that, if they found the first shot killed deceased, they could not convict the defendant because he fired a second shot while defendant was falling or after he had fallen—for two reasons: *first*, all the acts of defendant at the time of the killing are admissible as tending to establish defendant's intent; and, *second*, such an instruction is an unwarranted comment on the evidence.

7. **REMARKS OF COUNSEL: Lawlessness in County: Timely Objection.** An assertion by the prosecuting attorney that lawlessness is prevalent in the county and that the law can be enforced only against one class of citizens, is improper, but an objection to it made for the first time after the argument is closed, is not timely made.

Appeal from Dunklin Circuit Court.—*Hon. W. S. C. Walker*, Judge.

REVERSED AND REMANDED.

*T. R. R. Ely* and *Fort & Zimmerman* for appellant.

(1) If it be granted that the home of defendant's mother, after the separation, followed the home of deceased, still, the deceased, having established his home at a place other than the place where the mother lived, and where he was killed, could not claim the mother's home as his home, because he had established his home elsewhere. The law never required the husband to follow the wife to a new home, but at one time required the wife to follow the husband to the husband's new home. In this case, in no view of the law was the place where defendant's mother lived the home of the deceased and therefore, under the facts and circumstances of this case, deceased did not have as much right in the home of defendant's mother as defendant had. But the wife could acquire a separate home after the separation. There is substantial evidence in this record that defendant's mother and deceased had been living apart for quite awhile before the homicide; that

the deceased was to blame for the separation; that the place where the mother lived was her place; that deceased lived at another place and that the mother had tried to hire deceased not to bother her family again and not to visit her home again. Under such circumstances the home of defendant's mother was not the home of deceased. Gould v. Crow, 57 Mo. 204; Shute v. Sargent, 36 Atl. 282; Matter of Florance, 54 Hun (N. Y.), 328. The wife has a right to acquire a separate domicile where the separation is caused by the husband's misconduct, and no subsequently acquired domicile of his could draw after it her domicile. Shaw v. Shaw, 98 Mass. 158; Johnson v. Johnson, 57 Kan. 343; Derby v. Derby, 14 Ill. App. 645. If defendant's mother had the right to forbid the deceased to enter her home again, then she could delegate that right to her son, the defendant, and if she did delegate it to him he was guilty of no wrong in forbidding deceased to enter her home. Crittenden v. Com., 9 S. W. 386; Stanley v. Com., 6 S. W. 155. This instruction was a suggestion to the jury that, in the court's opinion, defendant was the aggressor in the difficulty in forbidding deceased to enter his mother's home without right to do so. Glaze v. State, 45 S. W. 906; State v. Lipp, 130 Mo. App. 400; Campbell v. Com., 11 S. W. 290. The right of the child to defend the mother against fraud and violence cannot be questioned on moral grounds, and if it may be questioned on legal grounds so much the worse for the law. Nor can such right be questioned in the light of nature's laws, for the latter laws have assigned this right to the beasts of the field and it prompts them to fly to their offspring when in danger of bodily harm. 25 Am. & Eng. Ency. Law (2 Ed.), 274; State v. Hickman, 95 Mo. 322; State v. Lipp, 130 Mo. App. 400. (2) The instruction being a good request for an instruction to the jury to the effect that if the jury found from the evidence that the first shot killed the deceased instant-

ly, and was fired by defendant in the necessary de-
fense of his life, then the fact, if the jury found it
to be a fact, that defendant fired a second shot into
the body of deceased, after he had fallen to the ground
and was dead, could not deprive defendant of his right
of self-defense at the time he fired the first shot,
should have been given, for the probabilities are
strong that, if it had been given, the jury would have
acquitted defendant on the ground of self-defense. If
the first shot killed the deceased instantly, and the
second shot was fired into the body of deceased after
he had fallen upon the ground and was dead, the de-
fendant committed no crime in firing the second shot.
Wilson v. State, 24 S. W. 409; Rogers v. State, 29 S.
W. 894; Anderson v. State, 65 S. W. 523; 21 Am. &
Eng. Ency. Law (2 Ed.), 92.

*John T. Barker*, Attorney-General, for the State;
*Paul P. Prosser*, of counsel.

(1) Appellant argues and presents authorities
upon the question of the lawful domicile of a husband
and wife who have separated from each other; but we
submit that the question of a lawful domicile for the
purpose of bringing a divorce suit, or any other suit,
is not the question involved here. The question here
is simply one of the rights of the parties in the pur-
view of the criminal law. No authority whatever is
needed upon the very elementary proposition that a
husband has the right to enter the home of his wife
and no man has the right to deny him that privilege.
Indeed, the fact is so self-evident, from the very re-
lation of husband and wife itself, that a definite state-
ment of such a rule would appear superfluous. And
that is as far as the instruction goes. In stating that
the deceased, Sam Jones, had "as much right" to
enter the home of his wife as did the defendant, the
instruction is altogether favorable to the defendant,

who did not have "as much right" to enter such home as did the deceased. Under the evidence, even as stated by defendant himself, the instruction was eminently proper. State v. Evans, 124 Mo. 410; State v. Reed, 154 Mo. 131; State v. Matthews, 148 Mo. 194; Commonwealth v. Johnson, 213 Pa. St., 432; Wharton on Homicide (3 Ed.), sec. 309. (2) Even if the first shot did kill the deceased, evidence of the second was certainly competent as a part of the *res gestae* and as showing the *animus* with which the act was committed. Whether part of the *res gestae* or not, we are not aware of any exception to the rule that the movements, actions, conduct and voluntary statements of a person charged with a crime, made after the commission of the alleged offense, are always competent evidence. State v. Gabriel, 88 Mo. 639; State v. Daly, 210 Mo. 676. It was not for the court to separate and divide the details of the one act, and an instruction attempting to dissociate the second shot from the first shot would have been manifestly improper and would have served only to confuse and mislead the jury. State v. Thornhill, 177 Mo. 697; State v. Edwards, 203 Mo. 545.

BROWN, P. J.—Charged with murdering his stepfather, Sam Jones, defendant was convicted of manslaughter in the fourth degree, and appeals from a judgment of the circuit court of Dunklin county fixing his punishment at two years in the penitentiary.

All parties connected with this tragedy were farmers residing in the southern part of Dunklin county, Missouri. In the year 1911, Sam Jones, the deceased, a man of fifty-seven years of age, was married to Mrs. M. L. Sinclair, a widow, who resided upon her own farm. She is the mother of defendant.

After the marriage deceased (Jones) lived upon his wife's farm; the family consisting of deceased, his wife, Jeff Sinclair, a fourteen year old son of his

State v. Sinclair.

wife by a former marriage, and Mrs. Gargus, his mother-in-law. The defendant resided on the same farm a short distance from his mother.

About six weeks before the tragedy deceased and his wife separated, deceased establishing his home with a half-brother named Baker about two miles from the home of his wife.

The cause of the separation is not made clear by the evidence. Deceased told one witness that he wanted to live with his wife, but she would not permit him. To some witnesses he indicated that defendant was responsible for the separation, and to other witnesses he placed the blame for the separation upon Mrs. Gargus, his mother-in-law. After the separation, deceased replevined a team of horses from his wife, which replevin suit was still pending when the killing oc curred.

On the morning of April 22, 1912, deceased went to the home of his wife for the alleged purpose of obtaining some clothes he had left there. He took with him a small repeating rifle, which he set down outside the yard. Defendant was at the home of his mother when deceased arrived there, and when deceased started to enter the yard defendant killed him with a shot gun.

Defendant's version of the shooting is that when he saw the deceased approaching his mother's house he warned him to stay out, but deceased did not stop. Defendant then took a shot gun out of the rack, loaded it and again told deceased not to come into the house, whereupon deceased placed his hand upon his hip pocket and said to defendant: "Don't you move or I will kill you." Defendant then shot deceased in the left side, killing him instantly. Two shots were fired, the last one when deceased was falling or after he had fallen.

There was no eye-witness to the killing except defendant. Jones's body was found just inside the

gate of his wife's yard. He had no weapon upon his person except a rock in his right hip pocket, which rock weighed about three-fourths of a pound. The coroner, a physician, gave it as his opinion that the rock was large enough with which to kill a man, but other witnesses stated that Jones had been carrying the rock a year or more "for luck" and they did not think it a dangerous weapon.

The first difficulty between defendant and deceased occurred in December, 1911, when they, with several other persons, were killing hogs. On that occasion defendant's fourteen year old brother, Jeff, was filling kettles with water to scald hogs. Deceased and defendant were scraping hogs with knives. Defendant's brother became very negligent about his work in filling the kettles and deceased started to slap him. At this point defendant became very angry and, sticking his knife in the ground, said to deceased: "By God, I won't stand for that." Whereupon deceased started to assault defendant with a knife, but was caught and prevented from doing so by one Bollinger, a bystander. A few hours later deceased stated to some parties with whom he was eating dinner that he was going to run his wife's farm or somebody would die.

Witness Robert Raines testified that he was at Mrs. Jones's house shortly after the separation and heard defendant state in the presence of his mother and grandmother that if deceased ever came to his house he would kill him. This threat was denied by defendant, his mother and also his grandmother.

A few weeks before the tragedy deceased visited the home of his wife in company with a neighbor to procure an account book he had left there. Defendant was in his mother's house at the time, but, at her request, he left just before deceased came in.

Mrs. Jones testified that when she and deceased separated, deceased told her that defendant was the cause of the separation, and that he (deceased) would

State v. Sinclair.

kill defendant if it was the last thing he ever did; "that they could not do any thing more than take him up to Kennett and hang him."

Mrs. Jones further testified that she communicated the above threat to defendant; that she was afraid of deceased and had requested defendant to protect her; that, although she had furnished the money to pay for the horses which deceased had replevined, she offered to give him the horses if he would go away and let her and her family alone. Mrs. Jones's testimony was somewhat weakened by the fact that she testified at the coroner's inquest that she had not heard deceased make any threats against defendant. She admitted swearing falsely at the inquest, but stated that she did so because she was advised by two of her neighbors not to tell the coroner anything except what happened the morning that her husband was killed. One of the neigh- bors admitted he gave her this advice.

Other threats were proved to have been made by deceased against defendant and some of them com- municated to the latter.

Practically all of the neighbors seemed to have understood that there was much animosity existing between deceased and defendant. Deceased's half- brother, Baker, with whom he was living, advised him not to go to his wife's house the morning of the kill- ing. Ed Chailland, a cousin, with whom deceased stopped several days after the separation, and who signed the deceased's bond in the replevin suit, testi- fied that he had advised deceased to stay away from the home of his wife, and that in response to this ad- vice deceased gave him the "horse laugh," and said that Albert (meaning defendant) did not have nerve enough to hurt anybody.

The defendant's explanation of the killing, made in the presence of his neighbors immediately after it took place, was substantially the same as his evidence given at the trial.

Defendant claimed that he had gone to his mother's house just a few minutes before Jones arrived to get some smoking tobacco which his younger brother, Jeff, told him was there. Defendant's mother testified that she saw deceased coming with a gun on his shoulder and that she went out in the garden back of the house where her mother was and, therefore, did not see the shooting.

A short while before the tragedy defendant was plowing in a field not far from his mother's home, and the surrounding circumstances were such that the jury might have inferred that he saw deceased approaching his mother's home and went there to drive him away or kill him. However, there was no direct evidence of that fact.

Most of the witnesses, both for the State and the defendant, testified that prior to the killing defendant bore a good reputation, except that on one occasion he deserted his wife during a short period of time.

I. The chief assignment of error relied upon for reversal is the giving of the following instruction upon behalf of the State.

Husband's Rights in his Wife's Home.

"11. You are further instructed that under the law Sam Jones had as much right to enter the home of Mrs. Sam Jones as did the defendant, and that the defendant had no legal right to forbid Sam Jones coming in at the home of his, Sam Jones's, wife, and you cannot justify or excuse the homicide, because you may believe from the evidence that the defendant forbade Sam Jones entering the yard or coming in at the home of his wife; and you are further instructed that the defendant had no right to use any force whatever to prohibit Sam Jones from entering that home or that house." Under the evidence in this case the giving of the above quoted instruction raises a somewhat delicate issue regarding the right of a husband who is not divorced from his wife,

but living apart from her, to enter, without invitation, a home which she has established on her own land.

The defendant denies that deceased (Sam Jones) had any right to enter upon or into the property of his wife, citing Gould v. Crow, 57 Mo. 1. c. 204; Shute v. Sargent, 36 Atl. 282; Matter of Florance, 54 Hun (N. Y.), 328. The effect of these decisions is that a wife, when not living with her husband, may establish a separate domicile, and that her husband's domicile does not, under all circumstances, draw to it the domicile of the wife.

To sustain the action of the trial court in giving instruction numbered 11 the Attorney-General cites the cases of State v. Evans, 124 Mo. 397; Commonwealth v. Johnson, 213 Pa. St. 432; and Wharton on Homicide (3 Ed.), sec. 309.

In the case of State v. Evans, 124 Mo. 1. c. 410, it was held that defendant Evans had the right to go into a field rented by deceased from defendant's wife to look after rents due to defendant's wife. That case is not in point here, because Evans was living with his wife, and it was not shown that the marriage did not take place at such a date as to give him a right to possess and collect the rents upon his wife's lands. [Vanata v. Johnson, 170 Mo. 269.] We regret to say we have not been able to derive much light on this issue from any of the cases cited by learned counsel for the State or defendant. The foreign cases cited do not give us much aid upon the nature of the statutes they construe and they are, therefore, not very helpful, for the reason that the domestic relations between husband and wife are governed almost exclusively by the statutory provision of each commonwealth.

There was a time when, under the common law and statutes of England, the identity of the wife and her property rights (if any she had) were almost completely absorbed by or merged in the husband. Those

arbitrary laws were, in a large measure, transplanted into this State by the adoption of the common law.

In Blackstone's time the husband possessed an almost unrestrained right to regulate the conduct of his wife and to use her property, as he desired. He could even chastise, detain, or force her to remain with him against her will. But that condition of affairs has passed away, both in this country and in England. [Tiffany's Persons & Domestic Relations (2 Ed.), p. 57.]

The rights of the wife to acquire and control her property free from the interference of her husband have multiplied so rapidly under our modern statutes that it is not an easy task to ascertain and define just what rights the husband retains to the society of his wife or the possession of her property at the present time.

We are impressed with the idea that in giving instruction numbered 11 the learned trial judge had in mind the husband's right to possess his wife's real estate under section 8309, Revised Statutes 1909, as this section stood prior to the amendment of 1889. [See Sec. 3296, R. S. 1879; Sec. 6869, R. S. 1889; Vanata v. Johnson, 170 Mo. 269.]

Section 8309, Revised Statutes 1909, at the time deceased married defendant's mother, contained the following provision:

"All real estate . . . belonging to any woman at her marriage . . . shall, together with all income, increase and profits thereof, be and remain her separate property and *under her sole control.*"

This section has been construed to give the wife the exclusive control of her real estate, regardless of whether she is living with or apart from her husband, and regardless of whether she is faithful or unfaithful to her marital obligations. [Woodward v. Woodward, 148 Mo. 241.] However, she may voluntarily permit her husband to remain in her home and enjoy the

use of her property without paying rent. [Donovan v. Griffith, 215 Mo. 149.]

We are unable to find any law which gives the husband while living apart from his wife any present rights in her real estate or any authority to enter upon same, except with her consent. The instruction complained of does not expressly say that the deceased had the right to enter his wife's home without her consent, but it at least implies as much, and to that extent it is erroneous.

We find that the statute hereinbefore quoted gave the wife of deceased the right, with or without cause, to exclude him from her home. The evidence of the State's witness Wagster, a relative of deceased, is to the effect that deceased wanted to resume marital relations with his wife, "but she would not let him." A fair inference to be drawn from this evidence is that the wife had expelled deceased from her home and forced him to live elsewhere. If his wife testified truthfully she was exceedingly solicitous that he should remain away and had offered to surrender her claim to the horses he had replevined, provided he would go away and let her and her family alone. She stated that after the separation she requested deceased several times to take all his things and stay away from her house.

She further testified that deceased threatened to kill defendant (her son); that she communicated this threat to defendant and asked him to protect her. If this testimony is true it is quite clear that defendant had a right to enter her home, and that she did not want deceased to come there any more.

The wife of deceased possessing, as we have seen, the lawful power to exclude him from her home, she undoubtedly had the right to call to her aid the defendant (her son) to assist her in accomplishing that result (1 Bishop's New Criminal Law, sec. 877); and,

therefore, instruction numbered 11 telling the jury that defendant had no greater right to be in the home of his mother than deceased, and that he had no right to forbid deceased entering said home, was erroneous, and ignored entirely the evidence of defendant and his mother. This instruction, under the evidence in this case, constituted reversible error. [12 Cyc. 653.]

It may not have been necessary for defendant to refuse to allow deceased to enter his mother's house in order to protect her. That was a question for the jury to pass upon in connection with all the other circumstances in the case. His act in forbidding the deceased to enter her house was not, under the circumstances, an unreasonable one, and he did not thereby provoke the difficulty so as to place himself beyond the protection of the law of self-defense.

Of course, the mere act of deceased in attempting to enter his wife's house without her permission or consent did not of itself justify defendant in killing him. No more force than is necessary should ever be used in preventing a trespass. However, the menacing attitude of deceased and his threats made at the time he was killed, if defendant related them correctly, justified the shooting. If the witnesses have testified truthfully the deceased had made enough threats to warrant the gravest apprehension on the part of defendant and his mother.

In addition to the threat made to defendant's mother, deceased told witness George Bollinger that he was going to run his wife's place or somebody would die. To witness Thompson he said: "Albert (defendant) has been meddling with my business and he is going to get hurt over it." Mrs. Celia Miles testified that deceased told her that while his wife furnished the money to pay for the horses about which the replevin suit was pending, he would get the horses or he would kill them. On being admonished that it would be as great a wrong to kill a horse as a man, deceased

replied: "Well, if it takes a man, a horse, or a whole family, that is what I will do." At least two of these threats were communicated to defendant before the tragedy.

When all these threats are considered we think it was not unreasonable for defendant and his mother to forbid deceased entering her home.

We take judicial knowledge of the fact that an interruption of marital relations usually provokes the most violent and enduring anger. The old adage that, "Hell hath no fury like a woman scorned," is only half of a well-known truth. It is the common knowledge of mankind that men frequently become so infuriated when their wives desert them that they assassinate their wives, as well as other persons suspected of giving aid or counsel to the deserting wife.

The learned Assistant Attorney-General in his oral argument at the bar of this court asserted that at the time the homicide took place negotiations were pending to bring about a reconciliation and a resumption of the marital relations between deceased and his wife; also that defendant's visit to his wife's home at the time he was killed was a peaceful mission to procure some clothes he had left there. One witness testified that he had made some effort to bring about a settlement of the lawsuit over the horses, but we have not been able to find a word of testimony in the record indicating that defendant's mother had said or done anything tending to prove that she wanted to become reconciled to deceased. If deceased's wife was desirous of re-establishing marital relations with her husband and there was substantial evidence that the last visit to her home was at her request, this case would appear in a very different light, but unfortunately for the State there is no evidence in the record before us to support that theory. In the light of the numerous threats made by deceased it was for the

jury to determine whether in going to his wife's house the last time he was on a peaceful mission or otherwise.

II. Defendant complains that the court refused Second an instruction, which, if given, would have Shot. told the jury that if they found that the first shot killed deceased, then they could not convict defendant because he fired the second shot.

This instruction was clearly erroneous and was properly refused. All the acts of defendant at the time of the killing were properly admissible as tending to establish his intent. [State v. Daly, 210 Mo. 664, l. c. 676.] This refused instruction violated another well-know rule of law, in that it was an unwarranted comment upon the evidence. [State v. Driscoll, 235 Mo. 377, l. c. 385; and State v. Pierce, 243 Mo. 524, l. c. 531.]

III. It was contended by defendant that the court committed reversible error in permitting Remarks the prosecuting attorney without reprimand of Counsel. to refer to the prevalence of lawlessness in Dunklin county, and the alleged fact that the law had been enforced only against one class of citizens.

It appears that defendant did not object to the improper remarks at the time they were made, but only after the argument was closed, and the court being in doubt as to the precise nature of the remarks made heard evidence upon that point in considering the motion for new trial. While that part of the argument of the prosecutor complained of was improper, objection to the same was not made in a timely manner and it is not necessary for us to determine whether such remarks were sufficient under the circumstances to work a reversal.

For the error of the trial court in giving instruction numbered 11 on the part of the State, its judgment is reversed and the cause remanded.

*Faris* and *Walker, JJ.,* concur.